Good morning, Justice Beeser, Trott, and Reimer. My name is Joel Spence. Well, we are just judges. The only justices are on the Supreme Court, but that's okay. We appreciate the pay raise and the promotion. Go ahead. Thank you for that clarification. I represent Mr. Dahl. I wonder if the smuggler who brought my applicant on deck of the container ship when confronted with a destination theretofore unknown, he said, don't worry, it's America. I wonder if his optimism would have continued if he had known the due process difficulties Mr. Dahl would experience in immigration court. I would like to speak about due process and, if we have time then, credibility. There are four problems with due process in this case. Number one is our unbiased arbiter held herself out to be an expert on all things nautical without the opportunity to cross-examine her knowledge or confront her conclusions. Number two, covered in the brief, interpretation problems that cause problems not only for the judge but also for the applicant. Number three, were the numerous discernible passages in the decision, which I covered during the brief. And four, not so much covered during the brief, but when I was reviewing the transcript recently, it occurred to me that the judge really imposed herself too much on proceedings contrary to Bandari, which is this court's case. Did you raise this issue before the BIA that the judge imposed herself too much on the proceedings? I don't recall. Well, if you didn't, even if it were an issue, it wouldn't be exhausted  Very well, Your Honor. Now, you're the same. You handled Mr. Dong's case from the beginning. I did. When you went into court, did you understand that he would have to establish that he filed his asylum application within a year of arriving in the United States? I did. Well, it seems that he fell short on that, and I've got a few questions for you. What's the evidence that shows that he did file it within one year of arriving in the United States? Other than his testimony, it was the identification card that was issued by the government that required him to be in China at least one year prior before filing his application. Well, didn't he rent, according to his testimony, he rented an apartment in the United States just a few days after arriving. Is that right? That's correct. Now, why was there no evidence submitted from a landlord or a lease or a tenant or somebody to corroborate that information? Because they many times do not have, if this were a house-hotel situation. He was still living there at the time of the hearing, if I understand the record correctly. Am I right? I believe so. Well, why couldn't you have just easily have brought in somebody from that location to corroborate his claim that he was there within a year? I don't understand that. Because the issue of jurisdiction is normally dealt with at the Anaheim level and it was not raised until we got to the merits hearing. You can raise jurisdiction in the Supreme Court and lose. I'm sorry? The question of jurisdiction can be raised in the Supreme Court for the first time and you'll lose. That is correct. We didn't think it was issued at that point. Well, you knew that you had to establish that he was there within a year. Yes, but we didn't think that that would be probative. Where he lived in the United States, we didn't think that would be probative because he could have lived anywhere for any period of time. But that wasn't his testimony. That wasn't his testimony. And sure, you're not required under certain circumstances to corroborate, but I mean, if he's trying to prove he was here within a year and he says, I'm living at that location, I mean, I don't understand why somebody didn't come in and say, yeah, he's living at that location. A landlord, a lease, or whatever it is, that escapes me. Leases are not common and landlords are reticent to come into immigration court. Did you check with the landlord? I don't know. I didn't recall that. So you didn't? Probably not. So how do you know he was reticent? I mean, now it seems like you're imposing yourself on the case the same way you said the IJ. Well, I may have been speculating, but it has been my experience in most of my cases that Asian landlords do not want to come to court. So you hit them with a subpoena. Nobody wants to come to court, so you give them a subpoena. That was an option that's very rare in immigration court. Now the same question is, who's this Wang person that supposedly translated and created this declaration? That was, if I recall, that would be Kathy Wong, and she was not in my office. She was working with a previous attorney. And who was that? My obvious question is, you know, there were differences between the declaration and the testimony, and his explanation was, well, that's what Mrs. Wang or whatever her name was told me to put down. And she says, don't put in too many details. You can save that for the hearing. Well, that went really strongly against your client's credibility, the differences between the declaration and the testimony. And I don't understand why that person wasn't brought in to say, yeah, I told him, don't be too specific. Wait until the testimony. I mean, that's another glaring error. You see, the burden is on you to prove your case. And I would think that when you were hit with that, at least in the middle of the hearing, when you found out that you were in trouble between the declaration and the whatever it is, you would have asked for time to bring in the person who supposedly did this. We have a case law in the Ninth Circuit that says if you testify with more details than what's in the statements, that's not a problem. Yes, it is a problem. It's absolutely a problem. In case after case, we find differences between the declarations, the statements to the officers, and then the testimony. And that's one of the factors that frequently is cited as a reason not to credit the testimony of an applicant for asylum, or at least to say that that applicant has not sustained his or her burden of carrying the case. So if you've got, I mean, you know who this person is, this person come in and say, yeah, I'm the culprit who told him to do that. I mean, you don't have a problem. And I don't understand why that didn't happen. The type of differences are not contradictions. It's merely fleshing out with details what he's already put in the declaration. Well, the I.J. said it was irreconcilable because, as the I.J. said, you know, ordinarily if you suffer this much damage and you're talking about this, it's in the declaration. So there was a difference between the declaration and the testimony. Well, I do recall a difference in dates, which we tried to correct. You mean the 1st and the 15th and all that? Yeah, but I'm talking about the big problem. You know, they said, well, why isn't this in the declaration? Well, Mrs. Wang told me not to put it in there. So where's Mrs. Wang? Well, my memory of Mrs. Wang, I had met her at one point in time very early. After a couple of years, she was no longer to be found. I had searched for her. Oh, you have? On another case and could not find her. And when was this? This was before Real ID Act, so this would be probably 2003 or 2004. All right. There are problems with the BIA's treatment of this case as well. They claim that the docs were not authenticated and were not properly translated. But that's not true. The most important doc, that ID card that he had to be in China for, that was shipped to the United States after he left. Is that the one that shows his address was the police station? That was the translation problem that we tried to clear up during the testimony, Your Honor. Well, I read that there was real problems with this identification card because it didn't have his address on it. It had the address of the police station. Well, that was his address. The translation had a semicolon showing police station and then there was his address. When you look at the card itself, it's clear that it's the same as the address on his previous card. It's the same as the address on his application and that sort of thing. So that's just a designation of the precinct, let's put it that way, where he lived? Partially. But his address on his ID card was his address, not the police's address. So you're banking your case of within a year on the theory that he had to be in China to get that card. Therefore, because of the time span, it was within a year. That's correct. That's correct. And it was authenticated. I did the con authentications twice during proceedings. Secondly, the government put it under a microscope and gave a good report on the card. The judge said that this card is extremely important to the one-year issue at the beginning of the hearing, at the beginning of the procedures. We were able to authenticate it. The government authenticated it. But something changed. The judge later minimized the importance of that particular card. What explanation did the judge give? I wasn't able to confront her on it because it happened during the decision. We've been asking her a lot of questions, and you're over time, but I still have another question. What concerns me, among other things in this case, is the number of indiscernibles in the record. I mean, how in the world are we supposed to review a record that's so loaded with that many indiscernibles? And I would have thought that you would have asked this case be remanded. I assume this was on a tape, right? And somebody took this off a tape and typed that up. Why didn't you make a motion to have this remanded to the I.J. and the I.J. be told, listen to the tape and fill in the indiscernibles? I did talk about it during my BIA brief. But you didn't point to any prejudice. That's what I'm getting at. Okay. And if you thought there had been prejudice, you were there, right? Yes, I was. So you should have known if there was some prejudice. Oh, my gosh, you said this, this, that, whatever. Let's get this filled in. But what's the showing of prejudice? It's impossible to know what the prejudice is without us knowing what was actually inside the discernible. And therefore, why didn't you ask that it be remanded in order for those indiscernibles to be filled in? Because I thought there was enough words that showed the faults in her analysis that the whole decision should have been attacked and dealt with at the BIA level. Should we remand this and should we tell the BIA, you know, straighten this out, fill in those indiscernibles? That's one option. I assert that there's enough other problems with the case that you can go beyond that. Okay. You've exceeded your time. We'll hear from the government. We'll give you an opportunity to respond. Thank you, Counsel. Mr. Scroggin, you're back with us. Yes, I am, Your Honor. May it please the Court, I am Don G. Scroggin, and I'm representing the United States Attorney General in this case. Your Honor, just to address a couple of the questions you've already raised, it is the burden of petitioner to show prejudice before this Court. And if the indiscernibles that are in the immigration judge's decision, fairly read in the 21-page decision, do not create ambiguity, as the Board found. Moreover, the Board's decision is the ultimate decision that is before this Court. And the Board was clearly able, as a reasonable person I would suggest would be, to determine both the bases of the immigration judge's decision and the specific findings. You must admit it's rather astonishing to have a report like that come through with that many indiscernibles. It is, Your Honor, although it is a matter of the technical difficulties. You're quite right. A tape is made and sometimes there are indiscernibles. But it is petitioner's burden to show prejudice, to show that the case might have turned out differently if those indiscernibles were filled in in some different way. Similarly, with the red herring of the 15, the list of 15 places where petitioner alleges that there was translation problems in the hearing. There was no offer of proof of what the testimony might have been had the testimony transcript been clear. Indeed, as the Board found, and as I have taken the time to find, and as the Board took the time to find, in every one of those 15 instances, the immigration judge would intervene and say, wait a minute, he didn't understand the question. Let's repeat the question. And all parties were satisfied. There was no offer of proof that the testimony was different. There were several hearings here, an ample opportunity for everyone to be heard. You've heard counsel's argument pretty much on the one-year issue, and that is that the identification card establishes beyond ambiguity that he was here within a year, that he filed within a year. Your response to that is? That was not the finding of the immigration judge. He was able to receive a replacement identification card while he was in the United States, and it was sent by his wife. And that's your position also? I'm here to defend the immigration judge's and the Board's decision. I have no independent judgment, Your Honor. I would simply say that the immigration – that the evidence showed that Petitioner had received a replacement card while he was in the United States, sent to him by his wife. If there is some ambiguity in the record, it certainly does not compel reversal of the immigration judge's finding on the one-year issue. Moreover, there is an alternative finding in this case. Petitioner was denied asylum on two grounds. The fact that he had been – Let me be precise. The evidence that's in the record, you don't believe it? I would simply say – You've got a card in the evidence, don't you? Yes, Your Honor. You say it's a fraud, or it doesn't say what it says? Fraud, Your Honor, might be too strong a word. I would say it is less persuasive than other evidence. Weight of evidence is different than fraud. And immigration judges, like district court judges, weigh evidence. And the fact that they give less weight to some evidence because it's not corroborated or translated or authenticated does not mean that it's fraudulent. It simply means it's less persuasive than other evidence. And I would say the second ground on which asylum was denied is totally sufficient to deny the petition in this case. Is there any evidence in the record supporting a denial by the board? I beg your pardon, Your Honor? Is there any evidence in the record supporting a denial, a specific denial of the validity of the document by the board? I'm not that I'm aware of, Your Honor. Doesn't it stand for what was offered for? Yes, Your Honor. It's unimpeached. But it doesn't change the result in the case, even if I would grant you your question and say that it was totally valid. The asylum application was also denied on the alternative. So even if we assume it was timely filed, it was denied on an alternative ground. It was denied on an alternative ground. That being? That being the lack of credibility. Both the immigration judge and the board denied asylum on two grounds, the lack of one year, demonstrating one year in the United States, and the fact that he was not credible. They also denied withholding and torture protection on the ground of credibility. With respect to credibility, I think it's important to reflect why I'm here. There are some, I would say up front, there are some weak findings of adverse credibility in the immigration judge's decision. Which are the weak ones? The weak ones are the number of gallons of gasoline that it takes for a boat. To run the boat? For a boat. I'm not an auditable man. I understand the immigration judge was, but I think. Okay, we won't pay any attention to the gas. Those don't matter. This Court has held that all it takes is one. Right. Inconsistency. What's your best one? Well, I would say there are several best ones. Okay. And that's what I'm here to point out. I'm trying to cut to the chase. Let's cut to the chase, Your Honor. And I would say I would cut to the chase is that there were significant omissions in Petitioner's asylum application. And he omitted things that go to the heart of his claim. These are not details. He omitted the fact that he had been beaten three times, not once. He omitted the fact that he had been knocked unconscious, something not mentioned. And as the immigration judge said, this is significant harm. Petitioner does not usually omit significant harm that occurs to him. His explanation as to why he omitted it simply makes no sense and was reasonably rejected by the immigration judge. What was the explanation? His explanation was this is mere details. I was told by Mrs. Wang not to include details. And no Mrs. Wang ever showed up to corroborate that. But they don't need Mrs. Wang to see that this explanation does not, will not pass muster. Look at the asylum application, the asylum statement itself. It has lots of details. It talks about what kind of carpentry he did in China, for heaven's sakes. It talks about the ---- I thought he was a farmer. He was also a carpenter. He said he was famous for his carpentry. He did projects in several cities. That's a level of detail that has nothing to do with his asylum application, but he included that in his asylum statement. As the immigration judge noted, his asylum statement is full of details about his wife's health, how many heart attacks she had had. This does not relate to the harm that he alleges that he suffered. So his explanation was reasonably rejected. There's a contradiction. He testified that he was, in his testimony, he says not only was he beaten three times and knocked unconscious, something that appears nowhere in his asylum application, but he creates a new offense that is truly horrifying, if we believe him, where he says he was forced to stand barefoot on cut glass and it cut his foot and it led to an infection and that afterwards his wife took him immediately to the hospital where he was treated. And he produces a medical certificate that expressly says on his face there were no lacerations. No lacerations on his feet? No lacerations anywhere. The medical certificate is in the record and it simply says that there, it reads quite simply that there is no lacerations. It's on page 452. It says multiple injuries found, whole body. There is no lacerated wound. Well, this is not support. His own evidence contradicts his statement. And these, all of these changes in his testimony from his asylum statement enhance his claim. This is significant to this court because this court has held that we find contradiction for petitioners changing his story that enhances his claim. That is significant. Demeanor, I think, is a trickier issue. Admittedly, demeanor is more subjective. However, this court has held that an immigration judge's judgment on demeanor should be given special deference. And I wouldn't be here if demeanor were all we had. But in the light of the significant omission of significant harm, being knocked unconscious, being beaten three times, the contradiction that he was, his feet were cut and he was infected  Demeanor does add, as this court has found, that when you have other components of an adverse credibility, then even minor inconsistencies can also contribute to that substantial evidence which supports the immigration judge's adverse credibility decision. I would invite the court. We talk a lot about due process here. There's no evidence of prejudice from the due process violations, even if they occurred. There's, first of all, no evidence that there were any due process violations. But even if there were, there's no evidence, as is petitioner's burden, to show prejudice. But I would invite the court, if you're interested in getting a flavor of what the immigration judge was talking about when he said that this witness was evasive, he squirmed in his seat, he refused to answer a question, his testimony sounded rehearsed, said the immigration judge, because he kept giving the same answer over and over again, no matter what the question was. One example that petitioner called a translation problem, but I think a fair reading, it's only two pages, would be to look at page 117 to 118 in the record. Where the immigration judge... Hold on, hold on, 117 to 118. 117 to 118. Where the immigration judge, and as I said, this is not of monumentally importance, but it gives a sense of the flavor of what was going on at the hearing. The immigration judge is asking him, where were you going when you left China? Not a difficult conceptual question. And on line four, the immigration judge says, and where were you going to go to? And the answer is, then on August the 15th, at 5 o'clock, I went to the dock. It's a non-responsive answer. The immigration judge comes back again, and again, later in the page, he says, go where? Where were you going? The answer, because I asked my wife where I should go. And she told me to go to the dock. And the immigration judge answers again, take you where? And the answer is, when I got on his boat, then he will take me. And the immigration judge, very patiently, says, yes, sir. But for someone to get on a boat in the middle of the night, did you not have some sense of where you were going? Answer, that was in the afternoon, about 5 o'clock, not in the evening. And the immigration judge, again, patiently says, all right, when you got on the boat at 5 o'clock, did you have some sense of where you were going? Answer, I knew the ship was going to the sea. Question from the immigration judge, and then where? Answer, well, then it will go to the sea, and somebody will meet me over there. And the immigration judge says, over where? Where were you going? And he says, he didn't tell me. This is, the reasonable immigration judge reached a reasonable inference that this man had a rehearsed story. He had rehearsed his testimony, and he answered only according to what he had memorized as his story. It was a reasonable inference. It's not dispositive of the case, but it gives a sense, I think, of the flavor. It adds to the substantive elements that truly do support the adverse credibility finding. Thank you, counsel. You may respond. And specifically, you may respond to all the omissions. They're willing to give you the timely thing, but they say, nevertheless, all these omissions and especially no lacerations on the medical report support the finding of no credibility, so therefore your case failed. Your response to that is what? And you're not interested in prejudice, then? Well, let's start with this. If I understand your question correctly. You heard him, right? Yes, I did. Okay. Your answer? Do you have one? He didn't change his story. He expounded upon his story. There were no embellishments. And Bondari states that if something is mentioned in the declaration, you can give details later on in testimony. So there wasn't a change in the story. Well, how about the explanation? He said, well, I was told to leave the details out, but if you look at the application, it's loaded with details. Your response to that is? And it's a long declaration. Most of our declarations are maybe two, two and a half pages, and this is longer than that. Well, full of details. Yes, but the details he put in there, he thought, were necessary because he was trying to explain how it was that he became a Christian. And that was the reason why they were persecuting him. So he wanted to assert, I'm a Christian, and I'm a Christian for these reasons. The BIA seemed to focus on the difference between the medical report and the testimony of your client. And what's the answer to that? The medical report says no lacerations, and he says I was cut to pieces. That is the only difficulty that we have in this case, Your Honor. One difficulty is enough. When he was asked how this could be, his answer was the doctor must have made a mistake. How many patients did the doctor see that day? We don't know, and he put the report in himself, or you did on his behalf. Yes. We had to work with what we had. Seems you would have been better off without the report. That may have been a strategic decision. But we decided that even if the doctor had made a mistake, which Chinese officials often do, and we have to deal with it in court, it nonetheless is the document that the hospital gave him. So if the officials in China make a mistake, does that automatically eliminate a legitimate claim in immigration court in the United States? Automatically no, but it may lead us to believe that the evidence doesn't compel us to overrule what the government's done. I would like to mention before I leave two examples of prejudice. The judge made a lot of hay on the $200 that he had in his pocket. She misstates the record. I think it was because of interpretation or accent of the interpreter. On page 147 is where it deals with it. He says the wife sent the money to him after he came. He did not have that in his pocket when he arrived. A second problem is five versus ten hours. There was an obvious problem with interpretation that caused confusion and very likely tainted the judge's feeling about whether or not she was being spoken to honestly. Go back again to the money business. What page is that on? That is 147. I think it's at the top of the page. 147 in the record. I touched apartments, apartments, apartments, apartments, three rooms, Z Chang. I don't see anything in the money. If I'm looking at the same 147 you are. I don't see anything in the money. You're looking at the BIA's pagination? That's the identification card. Nope. That doesn't help me. My notes must be in error then. But in the record where it does talk about the $200, it does not indicate that he had that with him all the time. I apologize for that. You don't know where that is? I've seen it myself but I can't put my finger on it right now. Other than that I could talk about demeanor. The judge insisted on not believing him when he gave the answer. I didn't know where I was going. The problems with interpretation, he wasn't understanding exactly what the judge was telling him initially, but the judge harangued him for an extended period of time on this particular issue, and he said several times, I did not know. He didn't want to believe that. Your time has expired. Unless Judge Reimer has any questions, this case will be order submitted. We thank you both. Thank you. If you want to sit down in the back and find the page and give it to the clerk, it might help us get to it when we talk about your case. Martin v. The Commissioner is submitted. We'll call United States v. Stanley.
judges: Beezer, Trott, Rymer